EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Puerto Rico Horse Owners Association (PRHOA)<br><br>Peticionaria<br><br>V.<br><br>Confederación Hípica de Puerto Rico<br><br>Recurrida | Certiorari<br><br>2019 TSPR 94<br><br>202 DPR ____ |

Número del Caso: AC-2016-135


Fecha: 10 de mayo de 2019


Tribunal de Apelaciones:

    Región Judicial de San Juan – Carolina y Humacao, Panel IX


Abogados de la parte peticionaria:

    Lcdo. Joel E. Rodríguez Rodríguez
    Lcda. Grace M. Santana Balado


Abogado de la parte recurrida:

    Lcdo. Roberto LeFranc Morales


Materia: Derecho Contractual – Obligaciones contractuales de exmiembros de una asociación luego de haberse desafiliado de la misma.


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Puerto Rico Horse Owners
Association (PRHOA)

     Peticionaria

                            AC-2016-0135

       v.

Confederación Hípica de
Puerto Rico

      Recurrida

Opinión del Tribunal emitida por el Juez Asociado señor Martínez Torres

En San Juan, Puerto Rico, a 10 de mayo de 2019.

Este caso trata sobre la relación contractual entre una asociación de dueños de caballos que participan del deporte hípico y la empresa que opera el hipódromo donde se practican las carreras. A principios de 2013, varios dueños de caballos se desafiliaron de la asociación existente y crearon una nueva. A pesar de ello, la empresa operadora continuó imponiéndoles las obligaciones que surgían de un contrato entre ella y la asociación de la que estos se desafiliaron. Como discutiremos, esta imposición es contraria a la ley.

I

La popularidad de los caballos en Puerto Rico dio paso al desarrollo de una industria deportiva robusta. Por ser una parte importante de nuestra economía, existe una instrumentalidad pública que regula todo lo relacionado con esta industria y deporte: la Administración de la Industria y el Deporte Hípico (AIDH). Existe también una Junta Hípica, con autoridad para celebrar vistas, dictar órdenes y resoluciones, iniciar procedimientos legales y revisar las decisiones emitidas por el Administrador Hípico, que es el funcionario ejecutivo y director administrativo de toda la actividad hípica en Puerto Rico, y por el Jurado Hípico, que es la autoridad suprema durante las carreras.

El 23 de enero de 2007, Camarero Race Track, que es la empresa operadora del hipódromo donde se celebran las carreras, contrató con la Confederación Hípica de Puerto Rico, que en aquel momento era la única asociación de dueños de caballos y agrupaba a casi la totalidad de estos, con excepción de unos pocos desafiliados. En la cláusula ocho del contrato, dispusieron que la Confederación y la totalidad de los dueños de caballos asumirían la mitad de la deuda contraída por la Confederación para mejoras a una clínica veterinaria, localizada en los predios del hipódromo. También se harían responsables por la mitad de los costos de cualquier equipo nuevo que la clínica adquiriera. Camarero asumiría

la otra mitad de la deuda y los costos. La administración de la clínica veterinaria se pactó a cargo de la Confederación, y los costos de operación, mantenimiento y reparación serían repartidos en partes iguales entre Camarero y la Confederación.

Para lograr los fines del contrato, Camarero comenzó a descontarle a todos los dueños de caballos premiados en las carreras una partida para la deuda y los costos de la clínica veterinaria. Esta retención se aplicaba por igual a todos los dueños de caballos.

Para marzo de 2013, varios miembros de la Confederación se desafiliaron y crearon la Puerto Rico Horse Owners Association (PRHOA), asociación que fue reconocida por la Junta Hípica. La gran mayoría de los dueños de caballos continúan afiliados a la Confederación, con excepción de los que se unieron a la PRHOA y de un puñado que no está afiliado a ninguna de las dos asociaciones.

No pasó mucho tiempo para que surgieran controversias entre las dos asociaciones. El 22 de octubre de 2013, la PRHOA reclamó ante la Junta Hípica que a sus miembros se les estaba ofreciendo trato desigual en la clínica veterinaria. Alegó que a los miembros de la PRHOA le cobraban más por los servicios que a los miembros de la Confederación, a pesar de que ambos realizaban las mismas aportaciones. Por ello, solicitó que se les reembolsara el veinticinco por ciento que, alegadamente, habían pagado en exceso por medicamentos desde marzo de 2013. Mediante una resolución dispositiva, el 10 de diciembre de 2013 la

Junta Hípica declaró no ha lugar la reclamación. Resolvió que la PRHOA no demostró trato injusto en contra de sus miembros y determinó que desde antes de que la PRHOA se creara, la Confederación, como administradora de la clínica, vendía los medicamentos a sus socios a un precio menor que el cobrado a los no afiliados.

No habiendo tenido éxito con ese reclamo, la PRHOA presentó uno distinto ante la Junta Hípica el 19 de diciembre de 2013. Esta vez, impugnó la totalidad del dinero que se le cobraba a sus miembros. Solicitó que se les devolviera la aportación hecha a la clínica veterinaria desde abril de 2013 hasta noviembre de 2013. Además, peticionó que a partir de la orden que en su día se emitiera, se le continuara liquidando a los miembros de la PRHOA, cada mes, el dinero que la PRHOA antes aportaba a la clínica veterinaria. En otras palabras, pidió que Camarero dejara de hacer la retención. Argumentó que los descuentos mencionados surgen del contrato suscrito por Camarero y la Confederación, y que ese contrato solo obliga a quien está afiliado a la Confederación.

La Confederación replicó que la reclamación era cosa juzgada, debido a que la PRHOA pudo haberla ventilado en el procedimiento anterior. También sostuvo que devolverle a la PRHOA el dinero reclamado constituiría enriquecimiento injusto de parte de esta, debido a que miembros de la PRHOA se beneficiaron de los servicios que les ofreció la clínica veterinaria durante los meses para los que ahora piden reembolso.

La Junta Hípica celebró una vista. Luego de los testimonios, la Confederación presentó una moción de desestimación, y la PRHOA su oposición.

Por medio de una resolución interlocutoria el 1 de abril de 2014, la Junta Hípica resolvió la controversia. Determinó que, ante la Junta Hípica, el contrato entre la Confederación y Camarero era válido y de aplicación a todos los dueños de caballos. Por ello, concluyó que el sistema establecido de retención a todos los dueños y la transferencia de ese dinero a la Confederación para la operación de la clínica veterinaria era legítimo, razonable y práctico. Además, estableció cómo debía llevarse a cabo la administración de la clínica veterinaria. Dispuso que, a partir de abril de 2014, cada asociación aportaría de manera proporcional a su cantidad de miembros. La Confederación, como asociación que aportaba la mayor parte, sería la administradora principal. La Junta Hípica enfatizó que la clínica veterinaria continuaría operando en el mejor bienestar de la industria hípica y que no se permitiría la duplicidad de servicios por el mero hecho de que la Confederación y la PRHOA no se pongan de acuerdo. Resolvió que, en cuanto a la administración de la clínica veterinaria hasta marzo de 2014, la Confederación tendría que devolver las partidas aportadas por la PRHOA desde noviembre de 2013 hasta marzo de 2014. O sea, desde el momento en que la PRHOA hizo su reclamo hasta el momento en que se estableció la doble administración. Finalmente, decretó que desde el 1 de abril de 2014 la PRHOA recibiría la

cantidad de dinero que produzca. Por lo tanto, que en lugar de que se les retengan sus ganancias, la PRHOA las recibiría todas y luego sería su responsabilidad hacer los pagos correspondientes para el mantenimiento de la clínica veterinaria.

La Confederación acudió al Tribunal de Apelaciones. Adujo, en lo pertinente, que la Junta Hípica erró al ordenar la devolución del dinero a la PRHOA y al establecer la coadministración de la clínica, pues ambos remedios menoscaban las obligaciones contractuales y la coadministración es un remedio que ninguna parte solicitó.

El Tribunal de Apelaciones entendió que esos errores se cometieron y revocó la resolución dispositiva mediante sentencia el 11 de julio de 2016. Determinó que la coadministración de la clínica constituía un remedio no solicitado que contravenía el contrato suscrito entre Camarero y la Confederación. Sobre la devolución de dinero, la sentencia del foro apelativo destacó que la Junta Hípica reconoció el contrato como válido y el sistema de retención y transferencia del dinero a todos los dueños de caballos para la operación de la clínica veterinaria como legítimo, razonable y práctico. Enfatizó que la Confederación operaba la clínica a favor de todos los dueños de caballos, sin importar su afiliación. Incluso, indicó que la PRHOA admitió que sus miembros se beneficiaron de estos servicios veterinarios. Por eso, el Tribunal de Apelaciones concluyó que la Junta Hípica no formuló determinaciones de hecho que sostuvieran su conclusión de que se debían devolver las retenciones

hechas por Camarero a los miembros de la PRHOA desde noviembre de 2013 hasta marzo de 2014.

La PRHOA apeló ante nos y señaló como error del Tribunal Apelativo haber revocado totalmente la resolución de la Junta Hípica, en especial la parte que le concedía el remedio solicitado. Argumentó que el Tribunal de Apelaciones solo debió revocar la parte de la resolución dispositiva que creó la coadministración de la clínica veterinaria, mas no la parte que concedía la devolución de dinero a la PRHOA. Según esta, bastaba el texto del contrato para demostrar que a sus miembros se les cobró indebidamente la aportación a la clínica y que, como consecuencia, tienen derecho al reembolso. Por eso, arguyó que la Junta Hípica estaba en posición de resolver sumariamente la controversia, y que el Tribunal de Apelaciones erró al concluir que la resolución de la Junta Hípica no se basó en hechos suficientes.

El 13 de enero de 2017, acogimos como _certiorari_ el recurso de apelación y le proveímos no ha lugar. El 31 de marzo de 2017, reconsideramos y expedimos el auto de _certiorari_. El 5 de julio de 2017, la Confederación presentó su alegato de oposición a los planteamientos de la PRHOA. Con el beneficio de ambas comparecencias, procedemos a resolver.

II

Para determinar si el Tribunal de Apelaciones erró al revocar la resolución dispositiva, en especial la parte que ordenaba la devolución de algunas de las partidas aportadas por la PRHOA a la clínica veterinaria, debemos

resolver si los miembros de la PRHOA estaban obligados por el contrato suscrito entre la Confederación y Camarero.

En esencia, el argumento de la PRHOA es que sus miembros no son parte de la Confederación, por lo que no se les deben imponer las obligaciones contractuales contraídas por esa asociación. La Confederación, en cambio, arguye que el contrato beneficia y obliga a todos los dueños de caballos, independientemente de su afiliación.

Según el alegato de la Confederación, el contrato es cónsono con la Ley de la Industria y el Deporte Hípico de Puerto Rico (Ley Hípica), Ley Núm. 83 de 2 de Julio de 1987 (15 LPRA sec. 198 et seq.), y la Interstate Horseracing Act de 1978 (15 U.S.C. sec. 3001 et seq.), que presuntamente la autorizan a asumir obligaciones en representación de todos los dueños de caballos, incluyendo a los no confederados. Al evaluar ambas leyes, vemos que ese planteamiento es errado.

A

La Confederación descansa primordialmente en que varias de las disposiciones de la ley local establecen que ciertas cosas se harán "conforme acuerdo entre la empresa operadora del hipódromo y los dueños de caballos". Alegato de la parte recurrida (Confederación), pág. 7. La ley, en efecto, así lo establece en varias partes, pero ello no tiene el alcance que la Confederación quiere darle.

El Art. 20 de la ley, 15 LPRA sec. 198s, detalla cómo se harán los descuentos en apuestas que los operadores de hipódromos reciban en sus hipódromos y agencias hípicas.

Para cada tipo de apuesta o premio, se disponen los descuentos que corresponden para comisiones de agentes hípicos, el Fondo General del Tesoro de Puerto Rico, el Fondo de Criadores, y los que se dividirán "conforme acuerdo entre empresa operadora del hipódromo y los dueños de los caballos." Íd.

La Confederación interpreta esto como que la empresa operadora llegará a un acuerdo con la asociación que represente a la mayoría de los dueños de caballos. No tiene razón. La ley es clara al decir "dueños de caballos" y no "asociación que representa a la mayoría de los dueños de caballos".

De hecho, la palabra "asociación" solo se menciona dos veces en la ley, y en ninguna de esas dos disposiciones se le otorgan responsabilidades o facultades significativas. La primera mención vino por una serie de enmiendas el 5 de junio de 2004. El propósito principal de estas fue reducir el impuesto que pagaban los dueños de caballos para fomentar que nuevos dueños adquirieran caballos. También se creó un sistema de renovación de licencias, un inventario de caballos y se aumentaron algunos aranceles. Véase Ley Núm. 139-2004 (2004 (Parte 1) Leyes de Puerto Rico 797-798).

Entre esas enmiendas, al Art. 6(b)(14), 15 LPRA sec. 198e(b)(14), que otorga a la Junta Hípica la facultad para someter al Gobernador un informe anual de sus operaciones, actuaciones, decisiones y recomendaciones para mejorar el hipismo, se le añadió que el informe "podrá incluir recomendaciones […] de la administración del hipódromo o

los hipódromos y de la asociación que representa a los dueños de caballo".

El 8 de diciembre de 2014 se aprobaron otras enmiendas a la ley. Esta vez, con el fin de modificar el proceso de revisión administrativa ante la Junta Hípica; modificar requisitos de las licencias; ampliar la capacidad de las empresas operadoras para llegar a acuerdos en torno a las apuestas interestatales; crear y eliminar ciertos fondos especiales, y eliminar algunos impuestos. Véase Ley Núm. 199-2014 (2014 (Parte 2) Leyes de Puerto Rico 1919-1920). El nuevo Art. 16 (d), 15 LPRA sec. 198o(d), dispuso, entre otras cosas, que las peticiones para exportar la señal de las carreras celebradas en vivo con el fin de tomar apuestas interestatales o internacionales deberán ser solicitadas a y aprobadas por el Administrador Hípico. Además, deberán "contar con el consentimiento de la agrupación que represente a la mayoría de los dueños de caballos que participan en el hipódromo solicitante o de los dueños directamente en caso de que no haya una asociación de dueños que represente a la mayoría de estos". Íd.

Estos dos artículos son la única mención que se hace en la ley de una asociación de dueños de caballos. Al leerlos, resulta evidente que la ley no exige que exista una asociación. El Art. 16(d), íd., incluso dice "en caso de que no haya una asociación de dueños". Podemos deducir que el legislador no quiso que las asociaciones de dueños de caballos fueran parte, propiamente hablando, del esquema legislativo de la industria hípica. Ni siquiera se

definió "asociación" en la parte de definiciones de la ley. De esta manera, el legislador dejó a los dueños de caballos libres de organizarse o no organizarse, según entiendan conveniente. No hay nada en el historial de la ley que apunte a una interpretación contraria.

En cuanto a la ley federal, el planteamiento también es inmeritorio. La Interstate Horseracing Act regula exclusivamente el comercio interestatal que se genera con respecto a las apuestas en las carreras de caballos. 15 U.S.C. sec. 3001(b). Se trata de una regulación limitada al aspecto interestatal, 15 U.S.C. sec. 3001(a)(3), y reconoce que cada estado tiene la responsabilidad primaria de determinar qué tipos de apuestas serán legales dentro de su jurisdicción. 15 U.S.C. sec. 3001(a)(1). Esta ley no otorga derechos ni impone obligaciones fuera del ámbito limitado para el que fue creada. Nada en ella puede leerse como otorgándole a la Confederación la facultad para negociar derechos y obligaciones a nombre de los dueños de caballos no afiliados a ella.

Como vemos, ninguna de las leyes exige que una asociación negocie los términos de todos los dueños de caballos. La Confederación intenta evadir esto con su argumento de que "no hay tal cosa, ni sería razonable, una relación individual de un dueño con la empresa operadora". Alegato de la parte recurrida (Confederación), pág. 8. No nos convence. Los dueños de caballos son libres para organizarse o no organizarse con el fin de lograr los términos que mejor les convengan en su relación con la empresa operadora. La ley no exige un intermediario.

B

Resuelto que no hay exigencia de ley, local ni federal, para que una sola asociación negocie los términos de todos los dueños de caballos, veamos si el contrato entre la Confederación y Camarero intentó establecer eso.

La cláusula cuatro del contrato dispone que la Confederación tiene en su matrícula a no menos de dos terceras partes de los dueños de caballos y que comparece en representación de sí y de esos dueños. También, que mientras la Confederación mantenga ese número de afiliados, Camarero la reconocerá como agente exclusiva y representante de esos dueños de caballos para negociar cualquier problema común a todos o a la mayoría de los dueños de caballos en el hipódromo. Pero, curiosamente, la cláusula treinta y siete, sobre autoridad para ejecutar el contrato, dice que la Confederación está contratando a nombre propio y de sus miembros. No dice que comparece en representación de los dueños de caballos no confederados.

El contrato está principalmente compuesto de cláusulas con obligaciones exclusivas a Camarero y a la Confederación. Sin embargo, impone algunas responsabilidades a todos los dueños de caballos, confederados y no confederados. El ejemplo más dramático es la cláusula ocho sobre la clínica veterinaria, que ya discutimos. Igualmente, según dispuesto en la cláusula diez, Camarero y la Confederación se obligaron a cubrir entre ambos las primas del plan de seguro médico para todos los corredores de caballo y los entrenadores, independientemente de su afiliación.

En conclusión, en el contrato entre la Confederación y Camarero sí se escribieron disposiciones con obligaciones para todos los dueños de caballos. Sin embargo, "[l]os contratos solo producen efecto entre las partes que los otorgan […]". Art. 1209 del Código Civil (31 LPRA sec. 3374). Nadie puede "contratar a nombre de otro sin estar por este autorizado o sin que tenga por la ley su representación legal". Art. 1211 del Código Civil (31 LPRA sec. 3376). Aunque el Art. 1209, 31 LPRA sec. 3374, contempla que se pacten estipulaciones en favor de un tercero y que este pueda exigir su cumplimiento, se requiere que antes le haga saber su aceptación al obligado. La Confederación no tiene autoridad legal para representar a los dueños de caballos no confederados. Tampoco tiene la autorización de estos.

III

Resta entonces resolver si el Tribunal de Apelaciones erró al revocar la resolución de la Junta Hípica. A modo de repaso, la Junta Hípica resolvió esencialmente que: (1) el contrato entre la Confederación y Camarero es válido y de aplicación a todos los dueños de caballos; (2) el sistema establecido de retención a todos los dueños de caballos para la operación de la clínica veterinaria era legítimo; (3) la clínica veterinaria estaría coadministrada por la Confederación y la PRHOA a partir de abril de 2014; (4) la Confederación tendrá que devolver las partidas aportadas por la PRHOA desde noviembre de 2013 hasta marzo de 2014, y (5) la PRHOA recibirá, desde el 1 de abril de 2014, la cantidad de dinero que genera en

las carreras, en lugar de que a sus miembros se les retengan sus ganancias.

Es principio reiterado que, de ordinario, los tribunales debemos deferencia a las interpretaciones y conclusiones de los organismos administrativos. Rebollo v. Yiyi Motors, 161 DPR 69, 77 (2004). Al ejercer su función revisora, el tribunal debe considerar la especialización y experiencia del organismo administrativo, por lo que deberá diferenciar entre los asuntos de discernimiento estatutario y las cuestiones de especialización administrativa. Íd. pág. 78. Sin embargo, lo anterior no equivale a la renuncia de la función revisora del tribunal. La deferencia al organismo administrativo cederá: (1) cuando no está basada en evidencia sustancial; (2) cuando el organismo administrativo ha errado en la aplicación de la ley, y (3) cuando ha mediado una actuación irrazonable o ilegal. Otero v. Toyota, 163 DPR 716, 729 (2005).

De acuerdo con los principios que deben guiar la revisión de decisiones administrativas, el Tribunal de Apelaciones no debió revocar la totalidad de la resolución dispositiva. La deferencia cede solo ante actos irrazonables, ilegales o no basados en evidencia sustancial.

La Confederación alegó que la controversia era un asunto técnico relativo a la industria, por lo que debe dársele deferencia a lo resuelto por la Junta Hípica en cuanto a que es uso y costumbre en la industria hípica, tanto en Puerto Rico como en Estados Unidos, que la

asociación que reúne a la mayoría de los dueños de caballos, en representación de todos, sea la que negocie con la empresa operadora del hipódromo los términos referentes a las ganancias por las carreras.

Sin embargo, el uso y la costumbre no deben usarse como fuente de derecho cuando hay leyes aplicables al caso. Art. 7 del Código Civil (31 LPRA sec. 7). La Ley Hípica y los principios discutidos de la teoría general de contratos prevalecen sobre el uso y la costumbre en la industria hípica.

De las determinaciones de la Junta Hípica, las primeras dos son ilegales y la tercera es irrazonable. El contrato entre la Confederación y Camarero no podía ser de aplicación a todos los dueños de caballos y el sistema de retención no era legítimo, pues se basó en las partes del contrato que no son válidas. En cuanto a la tercera determinación, el establecimiento de la coadministración de la clínica veterinaria entre la Confederación y la PRHOA, coincidimos con el Tribunal de Apelaciones. Esa determinación contravenía el contrato entre la Confederación y Camarero, en el que válidamente se dispuso que la Confederación administraría la clínica. A la Junta Hípica solo le correspondía resolver si procedía el reembolso solicitado. Obligar a la PRHOA a coadministrar la clínica veterinaria no era un remedio razonable, máxime cuando a la Junta Hípica no le fue traída ninguna controversia relacionada con la administración de la clínica y tampoco se pasó prueba sobre este asunto.

Ahora bien, las otras determinaciones de la Junta Hípica -que la Confederación devuelva las partidas aportadas por la PRHOA desde noviembre de 2013 hasta marzo de 2014, y que a la PRHOA no se le sigan reteniendo sus ganancias- debieron ser confirmadas. Ambas determinaciones son razonables y ninguna se basa en una aplicación errónea de la ley. Además, encuentran apoyo en la evidencia más importante del expediente: el contrato. Debido a que los miembros de la PRHOA no son parte del contrato, y que la ley no autoriza a la Confederación a contratar a nombre de los miembros de la PRHOA, las retenciones se realizaron indebidamente.

La doctrina del cobro de lo indebido, derivada de la de enriquecimiento injusto, es aplicable cuando: (1) se produjo un pago con la intención de extinguir una obligación; (2) el pago realizado no tenía una justa causa, es decir, que no existía obligación jurídica entre el que paga y el que cobra, o si la obligación existe, que era por una cuantía menor a la pagada, y (3) el pago fue hecho por error y no por mera liberalidad o por cualquier otro concepto. E.L.A. v. Crespo Torres, 180 DPR 776, 793-794 (2011). Cuando concurren estos tres requisitos, surge la obligación de restituir lo indebidamente cobrado. Art. 1795 del Código Civil (31 LPRA sec. 5121). Para efectos de la restitución, ya no existe en el derecho puertorriqueño distinción entre errores de hecho y errores de derecho. E.L.A. v. Crespo Torres, supra. Por ello, la interpretación errónea que de la ley y el contrato hicieron la Confederación y Camarero produjo la obligación

de restituir a la PRHOA lo que le fue indebidamente cobrado.

Sin embargo, no podemos ignorar el hecho de que los miembros de la PRHOA admitieron beneficiarse de servicios de la clínica veterinaria. Aunque lo cobrado a los miembros de la PRHOA fue indebido, si el dinero se les restituye sin más, los miembros de la PRHOA que acudieron a la clínica veterinaria estarían ahorrándose parte del gasto de los servicios veterinarios que usaron. Esta doctrina, fundada en la equidad, aplica ante un desplazamiento patrimonial que no encuentra una explicación razonable en el ordenamiento. E.L.A. v. Cole, 164 DPR 608, 632-633 (2005). Su modalidad positiva ocurre cuando hay un aumento en el patrimonio. Íd. pág. 634. La negativa se basa en la premisa de que un no gasto equivale a un ingreso. Íd. En este caso, la devolución de la retención, puede tener como consecuencia que los servicios veterinarios ya ofrecidos lo hayan sido gratuitamente o a un costo inferior del que tuvieron, lo que cumpliría con los cinco requisitos para que aplique la doctrina de enriquecimiento injusto: (1) existencia de un enriquecimiento; (2) un correlativo empobrecimiento; (3) una conexión entre dicho empobrecimiento y enriquecimiento; (4) falta de una causa que justifique el enriquecimiento, e (5) inexistencia de un precepto legal que excluya la aplicación del enriquecimiento sin causa. Íd. pág. 633.

Para evitar que la PRHOA o la Confederación se enriquezcan injustamente, procede la mutua restitución

dirigida a restablecer el equilibrio entre los dos patrimonios afectados por el desplazamiento injustificado. Véase Ortiz Andújar v. E.L.A., 122 DPR 817, 825-826 (1988). Por ello, la restitución no puede ser superior al aumento patrimonial experimentado por la parte beneficiada. Íd. pág. 826.

IV

La PRHOA tiene razón. Erró el Tribunal de Apelaciones al revocar en su totalidad la resolución dispositiva. Se dictará una Sentencia en la que dejamos sin efecto la sentencia del foro apelativo y mantenemos vigente aquellas partes de la resolución de la Junta Hípica que sean compatibles con lo expuesto en esta Opinión.

Los miembros de la PRHOA no están sujetos a las obligaciones y beneficios pactados en el contrato entre la Confederación y Camarero. Por eso, tienen derecho a que se les devuelvan las sumas que se les retuvieron indebidamente, una vez descontado el gasto por aquellos servicios veterinarios que utilizaron. Se devuelve a la Junta Hípica a tal fin.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Puerto Rico Horse Owners
Association (PRHOA)

    Peticionaria

                          AC-2016-0135

      v.

Confederación Hípica de
Puerto Rico

    Recurrida

SENTENCIA

En San Juan, Puerto Rico, a 10 de mayo de 2019.

Por los fundamentos antes expuestos, en la Opinión que antecede, la cual se hace formar parte de esta Sentencia, se deja sin efecto la sentencia del foro apelativo y mantenemos vigente aquellas partes de la resolución de la Junta Hípica que sean compatibles con lo expuesto en esta Opinión.

Los miembros de la PRHOA no están sujetos a las obligaciones y beneficios pactados en el contrato entre la Confederación y Camarero. Por eso, tienen derecho a que se les devuelvan las sumas que se les retuvieron indebidamente, una vez descontado el gasto por aquellos servicios veterinarios que utilizaron. Se devuelve a la Junta Hípica a tal fin.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez y el Juez Asociado señor Colón Pérez no intervinieron. La Juez Asociada señora Rodríguez Rodríguez no interviene. La Jueza Asociada señora Pabón Charneco está inhibida.

                  José Ignacio Campos Pérez
               Secretario del Tribunal Supremo